IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2018 Session

## STATE OF TENNESSEE v. DAMARKUS LOWE

**Appeal from the Criminal Court for Knox County**
**No. 99837A      Steven W. Sword, Judge**

---

### No. E2017-00435-CCA-R3-CD

---

The Defendant, Damarkus Lowe, appeals his jury conviction for first degree murder, for which he received a sentence of life imprisonment.  In this direct appeal, the Defendant alleges the following errors: (1) that the evidence was insufficient to support his conviction, challenging the evidence establishing premeditation and criminal responsibility, and alleging that the accomplice testimony was not sufficiently corroborated; (2) that admission of a packet of letters sent to the police anonymously, which contained a note from the anonymous source and three letters allegedly authored by the Defendant that he mailed from jail to his associates, was improper because the letters were not properly authenticated, contained inadmissible hearsay, violated his confrontation rights, and were more prejudicial than probative; (3) that recorded jail calls containing inadmissible hearsay were erroneously admitted in violation of his confrontation rights; (4) that testimony regarding his "street name" of "D-Ru" was irrelevant and more prejudicial than probative; (5) that the trial court acted in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963), when it failed to compel the State to disclose the name of a jailhouse informant who claimed to have information related to the victim's murder; and (6) that the State committed prosecutorial misconduct during its closing argument by improperly vouching for several witnesses' credibility requiring plain error relief.  Following our review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Forrest L. Wallace, Knoxville, Tennessee, for the appellant, Damarkus Lowe.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

Following the April 2012 shooting death of William Watson ("the victim"), a Knox County grand jury charged the Defendant, along with Michael May, with the first degree premeditated murder of the victim and two alternative counts of especially aggravated kidnapping involving Myshauna Blair. See Tenn. Code Ann. §§ 39-13-202, 305. The Defendant proceeded to a trial by jury on June 30 through July 3, 2014.

A. Eyewitness testimony. Jonathan Borden testified that, on April 1, 2012, he was working on his broken-down car, a gray Toyota that was parked near the intersection of Mississippi Avenue and Toms Street in Knoxville. He lived at the "top of the hill" on Mississippi Avenue, and a football field was on the other side of street from his house and the intersection. According to Mr. Borden, while he was working on the car, he saw a silver Buick, which was being followed by a green Corvette, stopped near the intersection. Mr. Borden said that, after the cars came to stop "side by side," an argument ensued between the driver of the Corvette and a woman who got out of the Buick. Mr. Borden "ignored it" and returned to working on his car. "The next thing" Mr. Borden knew, he "looked back up" and saw "two guys in a hoodie" shooting into the Corvette. According to Mr. Borden, one shooter was standing on the side of the Corvette and the other was standing in front. Mr. Borden said that, after the shooting, the people in the silver Buick immediately "[j]ust took off." Mr. Borden estimated that he was approximately thirty or forty feet away from where the shooting took place.

Mr. Borden testified that, after the Buick left, he went to check on the passenger inside the Corvette. According to Mr. Borden, the Corvette door was open, and he saw that the passenger had suffered multiple gunshot wounds. He remained on the scene until police arrived. Although Mr. Borden's father and several others were nearby, Mr. Borden opined that "they didn't really see" what happened because they "were up front[.]"

On cross-examination, Mr. Borden revealed that, after the shooting in this case, he had suffered a head injury in a motor vehicle accident that caused him to have difficulty remembering things. Mr. Borden recalled being interviewed by the police in the early morning hours after the shooting, but he could not recall the details of that interview. Accordingly, the parties agreed to admit Mr. Borden's prior police statement as substantive evidence. In the statement he gave to Knoxville Police Department ("KPD") Investigator A.J. Loeffler, Mr. Borden provided further details about the argument that

took place between the vehicles' occupants: "Like something about, 'you like hit my car, you hit my car.' And then dude was like . . . 'what are you talking about?' And then he was like 'you hit my third anniversary new Corvette.'" Furthermore, Mr. Borden said that he returned to working on his car, and when he "look[ed] up," he saw a young, African-American male passenger emerge from the Buick with "a dumb look on his face[,] [l]ike 'what's going on.'" Mr. Borden continued by telling Investigator Loeffler that the next time he looked up, he observed two other men shoot multiple times into the Corvette—one was shooting into the windshield and the other was near the back of the Corvette. He did not know how these two men arrived on the scene, stating that they "just came out." According to Mr. Borden, the man in "front shot more than the [man in the] back." During the interview, Mr. Borden was able to give the police a partial identification of the Buick's license plate and identifying information about the Buick itself. In addition, Mr. Borden said that he saw a semi-automatic pistol, possibly a 9 mm. Mr. Borden was unable to identify anyone from a photographic line-up.

Angela Branch, Mr. Borden's girlfriend, testified that she also witnessed the April 1, 2012 shooting. According to Ms. Branch, she was sitting in the front seat of Mr. Borden's Toyota "[a]t the bottom of the hill from his house" around 4:00 p.m. that day. She testified that, while she was sitting there, she saw two cars come "flying down" Toms Street; that they "sort of ran the stop sign"; that they "then pulled up a little bit more" and came to a stop; that "the guy in the Corvette was yelling, 'You f--cked up my car'"; that "the driver of the Buick started to step outside of her car"; and that "they were talking." According to Ms. Branch, there was a passenger in the Buick as well, and she saw both "the driver and the passenger get out" of the car and stay beside the passenger-side door. As they conversed, Ms. Branch watched "two guys come running" through the football field, at least one had his weapon drawn at that time, and they joined the argument and then started shooting. According to Ms. Branch, the two shooters were African-American and wearing all black, and one of the shooters was positioned at the front of the Corvette and the other at the back. She testified that she heard a total of "three to five" gunshots. When the shots ceased, they "all jumped into the Buick and took off."

Ms. Branch testified that she, Mr. Borden, Mr. Borden's father, and Timothy Doane, all went to check on the driver of the Corvette after the Buick left. She saw through the open driver-side door that the driver was bleeding from his head. Ms. Branch confirmed that she gave a statement to Investigator Loeffler during the early morning hours of the following day and that she was unable to identify anyone from a photographic line-up.

On cross-examination, Ms. Branch explained that the two cars were "[n]ot necessarily [parked] side by side, but kind of parallel." Ms. Branch further testified that

the driver of the Corvette exited his vehicle, but "he stayed right beside his car too." Ms. Branch said that the driver of the Buick was wearing all black and a hooded sweatshirt. She could not recall what the Buick's passenger was wearing. According to Ms. Branch, the passenger of the Buick was male, and she was also "[p]retty sure" that the driver of the Buick was male. She was positive that both of the men that came running through the field fired their weapons. Furthermore, she testified that the Buick left "immediately after the people got back" inside and that there was no hesitation.

Ms. Branch agreed that, when she was interviewed by Investigator Loeffler, she told him that the driver of the Buick was involved in the shooting. However, she explained that she "just got confused by everyone else's . . . stories from that night." According to Ms. Branch, both Mr. Borden's father and Mr. Doane said that the driver was involved. Furthermore, Ms. Branch confirmed that she told the defense investigator that the driver of the Buick "looked like a girl." On redirect, Ms. Branch averred that she was "trying to do [her] best to remember."

B. <u>Myshauna Blair's testimony</u>. Initially, Ms. Blair confirmed that she knew the Defendant and was asked, "[D]o you know him by any other name other than Damarkus?" Ms. Blair replied, "D-Ru." Ms. Blair also testified that she knew Michael May because they had grown up together in the Knoxville community of Mechanicsville.

In April 2012, Ms. Blair was in the process of acquiring a silver Buick "from a woman who live in the neighborhood." Ms. Blair was still paying for the car, and it had not yet been registered in Ms. Blair's name. At that time, Ms. Blair was unemployed and was "hanging around with" Mr. May and "a few other people." During the afternoon hours of April 1, 2012, Mr. May called Ms. Blair for a ride, and she agreed. According to Ms. Blair she did not have a phone of her own at that time, so Mr. May reached her on her sister's telephone. Ms. Blair testified that she picked up Mr. May, that he was accompanied by the Defendant, and that she dropped the pair "off in Mechanicsville in front of Maynard Elementary" around 1:30 or 2:00 p.m. Mr. May gave Ms. Blair his phone so he could call her for a ride when they were ready to be picked up. Around 3:00 p.m., after Ms. Blair had completed filling out job applications on Western Avenue, Mr. May used the Defendant's phone and called her to come pick them up from the football field known as "Raider's field." Ms. Blair knew it was the Defendant's phone because the number "was logged in the phone as D-Ru."

After receiving Mr. May's phone call, Ms. Blair made a U-turn to return to the Raider's Field area, and when she did so, she collided with the victim, who was driving his green Corvette. Ms. Blair fled the scene because she did not have a license or insurance, but the victim pursued her. Upon arriving at Raider's Field, she stopped near the intersection of Mississippi Avenue and Toms Street, and the victim "pulled up right beside" her. According to Ms. Blair, her window was already rolled down, and when the

victim rolled his window down, he started telling her that she "had just wrecked his [thirtieth] anniversary car, and that [she] was going to pay for it." While the victim was "mad" at first, he "calmed down," and they were trying to work out "a payment plan." According to Ms. Blair, she had some "money in [her] pocket at the time" and was going to give it to the victim because his car only suffered minor damage. Furthermore, she "was going to give him [her] information and everything to get set up on a payment plan."

While they were making arrangements, Mr. May, the Defendant, and another individual, whom Ms. Blair referred to as "Spruce," came through the football field towards the location where she and the victim were conversing. According to Ms. Blair, the Defendant and Mr. May had their "guns out" at that time. She described the guns as revolvers, "little cowboy guns." Ms. Blair believed that the victim was scared and that he "was probably about to take off and run." However, as soon as the men arrived at their location, Mr. May went to the front of Ms. Blair's car and the Defendant went to the back of the victim's car. Spruce did not have a weapon and got inside Ms. Blair's car.

Ms. Blair said that Mr. May shot first, firing through the victim's front window three times, and that the Defendant then started shooting through the victim's back window. She saw the victim's "head go back" and "blood everywhere." According to Ms. Blair, the men "hopped" into her car and told her "to pull off." Ms. Blair said that she "sat there for a minute" before she drove away because she was scared having "never been in a situation like that" previously. Ms. Blair further described that, once the men were inside her car, it seemed like they "didn't care" about what they had done, "like it was a joke," or they were doing "it for fun." Ms. Blair said that she dropped the men off at Walter P. Taylor Homes and went home and cried.

Ms. Blair testified that, later that evening around 8:00 p.m., she went to visit her girlfriend, Kasandra Flood, who worked at Shannondale Nursing Home. According to Ms. Blair, her sister went with her to the nursing home. Ms. Blair said that, when she arrived at the nursing home, she "started busting out crying" and told them what had happened. Ms. Blair said that she did not go to the police because the Defendant threatened to kill her if she talked. Ms. Blair averred that she was not a willing participant in these events.

Ms. Blair testified that, after these events, she moved away from Knoxville because she was being threatened and her mother was being harassed. According to Ms. Blair, her mother's house had been broken into four times in "retaliation," causing her mother to "disown[]" Ms. Blair. Ms. Blair further explained that her mother was scared because the Defendant's "people" had "money on [Ms. Blair's] head."

-5-

On cross-examination, Ms. Blair confirmed that she spoke with Investigator Loeffler on April 4, 2012, about these events and that she was on probation at that time. She clarified that Mr. May called her twice, once to tell her to come pick them up and another time to provide an exact location. Ms. Blair testified that, when Mr. May arrived on the scene, he asked the victim "what was going on," and the victim repeated the events of the accident and said "y'all" are going to pay for the damage. Mr. May then opened fire. Ms. Blair maintained that the victim never threatened to shoot her or "use violence against" her, despite her statement to Investigator Loeffler that the victim said, "I'm about to shoot the f--k out of you." She explained that she made this statement to Investigator Loeffler because she was scared.

Ms. Blair maintained that the victim was not in possession of a weapon during these events, that she arrived at Raider's Field alone, that no one else was in the car with her at that time, and that she never got out of her vehicle. She further testified that, after the shooting, she was in "shock" and that approximately two to three minutes elapsed once the men got inside her car before she drove away. Ms. Blair said that Mr. May "put the gun to" her and ordered her to drive away from the scene. Ms. Blair also testified that she returned Mr. May's phone to him when she dropped them off at Walter P. Taylor Homes, and she averred that she had no additional contact with Mr. May or the Defendant for "the rest of the day." Additionally, Ms. Blair said that the men were wearing all black but that she was wearing a gray shirt.

When asked if anyone had given her a gun "to get rid of," Ms. Blair responded in the negative. She averred that the men took their weapons with them when they exited her car. Furthermore, Ms. Blair was told that she would not be prosecuted in exchange for her cooperation in this matter, and her misdemeanor probation "was squashed" in order to allow her to leave town after she was threatened.

C. Police Investigation. Mr. May's cell phone records for his number ending in 6618[1] were entered into evidence. The records showed that, on April 1, 2012, several calls were placed between 6618 and a number ending in 7379. Three calls were made from 6618 to 7379[2] at approximately 4:01 p.m., 4:02 p.m., and 4:09 p.m. At 4:15 p.m., Mr. May's phone received a call from 7379 that lasted for thirteen seconds. Also, it was noted that, on that same day, multiple calls were placed between 6618 and another number ending in 4421. The calls between these two numbers started at 12:26 p.m., and the last one was placed at 11:58 p.m. that day.

---

[1] For purposes of anonymity and clarity, we will refer to telephone numbers using the last four digits only.

[2] This appears to be the Defendant's phone number.

Lieutenant Steven Patrick testified that he worked for the Knox County Sheriff's Department and that he maintained records of telephone calls made from the Knox County Detention Facility. He stated that he also kept records of incoming and outgoing mail from the detention facility, as well as records of visitation.

Lieutenant Patrick relayed that Trinity Peoples and Desharya Taylor were on the Defendant's permitted visitor list. According to Lieutenant Patrick, Ms. Taylor visited the Defendant on June 1, 2012, at 3:00 p.m. Ms. Taylor visited the Defendant six more times in 2013 and 2014.

Lieutenant Patrick confirmed that all of the inmates' calls were recorded, except for "legal calls." According to Lieutenant Patrick, an inmate must use their unique twelve-digit identification number and state their first and last name "to authenticate for the computer before it will allow them to proceed" to place a call. Four of the Defendant's phone calls were then played for the jury—calls occurring on April 18, 2012; June 27, 2012; June 28, 2012; and July 5, 2012. The April 18, 2012 call was described as "very brief," and no transcript of that call was entered into evidence. Transcripts of the June and July 2012 calls were entered into evidence for identification purposes only.[3] While a disc purporting to contain the audio recording of these phone calls was entered into evidence, none of the files on that disc match the conversations memorialized in the transcript. The thirty-seven calls recorded on that disc appear to be from 2013.

The transcript reflects that, during the call on June 27, 2012, the Defendant is referred to and responds to the nickname "Ru." While discussing court dates and jail time with the unidentified female caller, the Defendant said, "I don't know what....I'm gonna try and see if they offer me at least 25-30 or something…man, I don't know. But see I... I... I'll take anything but life though...(chuckle). You feel me…for real." According to the transcript of the call on June 28, 2012, the Defendant identifies himself as "D-Ru." The following exchange also took place:

> [THE DEFEDANT]: I just came back from court man today man.
> [UNIDENTIFIED PERSON]: What they talking about?
> [THE DEFEDANT]: See my s--t got…went from grand jury… they kept my s--t at 1st degree murder and that motherf--king aggravated kidnapping man.
> [UNIDENTIFIED PERSON]: D--n.
> …(unintelligible due to both talking at once).

---

[3] The trial court instructed the jury that transcripts were not evidence but were merely an aid to help them follow along.

[UNIDENTIFIED PERSON]: Well Mysha[u]na…motherf--ker was looking for her.

[THE DEFEDANT]: Man, n---ers ain't looking for her man. I ain't even worried about it man. F--k them n---ers man. Real talk man…real talk. For all that s--t I been doing for them b---h a-- n---ers, they ain't never did s--t and I ain't really talk man. They said…they….

The transcript of the last call placed on July 5, 2012, reflects that the Defendant spoke with his Aunt Mary and another unidentified individual. The relevant portion of that call is as follows:

[AUNT MARY]: Okay, now uh…uh…when is your trial?

[THE DEFENDANT]: I'm not going to trial. I'm gonna…I'm…I'm trying to get a plea bargain so I can make a plea. I'm not trying to go to trial. If I go to trial, then I'm gonna get the same time my daddy got and I'm not trying to…I'm trying to get about 15 years at the most.

[AUNT MARY]: Hmm…okay. So when is all that gonna happen?

[THE DEFENDANT]: Uh…I go to court on the 12th of this month and they might come at me with a plea then. But I ain't trying to take no 25 or 85 or no 20 to 85. I'm gonna try to see if they'll give me 15-85 and I'll….and I'll sign for that but, I'm [Range] 1 so I'm gonna…I'm gonna get some kind of nice little deal cause it's my first time going to prison.

[AUNT MARY]: Um…you don't think you can get out of it?

[THE DEFENDANT]: Uh…no.

. . . .

[UNIDENTIFIED PERSON]: So what did…what did they end up giving you?

[THE DEFENDANT]: First degree murder and aggravated kidnapping.

[UNIDENTIFIED PERSON]: Dang boy what did you do…(chuckle)?

[THE DEFENDANT]: I didn't…I ain't kidnapped nobody. She…she…she lying on me but….

[UNIDENTIFIED PERSON]: Uh huh.

[THE DEFENDANT]: …but Knoxville…our law so messed up that s--t...that….it…all she got to do is say I did it and I did to them folks so…

[UNIDENTIFIED PERSON]: Oh yeah, that's the truth. That'd be the truth so uh…how long…25?

[THE DEFENDANT]: Um, I'm trying to see if I can get 18 to…I mean, 15 to 85, which will mean like about 12…uh…11 or 12 years. But I ain't…I ain't trying to get what my daddy got at all. I ain't…I ain't trying to get it. And if I go to trial, they gonna hit me with 51 years or more, so I ain't….I ain't….

[UNIDENTIFIED PERSON]: Oh hell yeah.

[THE DEFENDANT]: …trying for that.

[UNIDENTIFIED PERSON]: So what other way…what other way around it can you go for?

[THE DEFENDANT]: Uh, I guess just do a plea and…and be a man and go to prison.

[UNIDENTIFIED PERSON]: Ah…you done the time…you done the crime; you might as well go ahead and do that time though…(chuckle).

[THE DEFENDANT]: Yeah and…

[UNIDENTIFIED PERSON]: I hate to say it….

[THE DEFENDANT]: Right.

[UNIDENTIFIED PERSON]: I hate to say it, but you know the rules…you know the street rules.

[THE DEFENDANT]: Uh huh.

[UNIDENTIFIED PERSON]: You know the street rules; you get caught, you gotta do it….(chuckle).

[THE DEFENDANT]: I know. If I do the crime, I got to do the time.

[UNIDENTIFIED PERSON]: Dude…dude, for real…(chuckle)? Was you mad that day or something?

[THE DEFENDANT]: Huh?

[UNIDENTIFIED PERSON]: Were you mad that day?

[THE DEFENDANT]: Naw, I wasn't…no, I wasn't mad; I just…it wasn't even…it…it was a lot of stuff going on.

Next, Lieutenant Patrick described the process for tracking the detention facility's incoming and outgoing mail. According to Lieutenant Patrick, an inmate will submit an outgoing letter to his pod officer, who then turns the letter into the mailroom, where it is stamped and sent to the post office. The letters were only opened if the facility had received a request from the District Attorney's Office "for a known security threat" or if an inmate was "on the watch list." Moreover, Lieutenant Patrick stated that he had not "encountered an experience where an inmate might forge another inmate's name."

The log for the Defendant's outgoing mail reflected that he mailed letters to (1) Deshayra Taylor on May 23, 2012; July 19, 2012; February 28, 2013; July 7, 2013; July 25, 2013; August 30, 2013; September 19, 2013; October 1, 2013; October 16, 2013; December 5, 2013; December 12, 2013; and April 8, 2014; and (2) Trinity Peoples on April 11, 2012; May 1, 2012; May 23, 2012; June 7, 2012 (addressed to 322 McConnell Avenue); July 16, 2012; August 10, 2012; August 21, 2012; September 7, 2012; September 13, 2012; September 27, 2012; October 12, 2012; October 25, 2012; November 16, 2012; December 14, 2012; January 3, 2013; May 8, 2013; May 24, 2013; June 6, 2013 (2 letters); June 21, 2013; August 7, 2013; August 19, 2013; November 1, 2013; December 5, 2013; and January 19, 2014. The Defendant also received approximately forty-three letters from these two women during this timeframe, thirteen from Ms. Taylor and thirty from Ms. Peoples.

Investigator A.J. Loeffler was assigned to the Violent Crimes Unit of the KPD and was involved in the investigation of the victim's murder and was responsible for interviewing the witnesses. He recalled interviewing April Lyons and Timothy Doane at the scene, as those were the individuals who spoke with 9-1-1. Later, he "realize[d] that there were other people who were present at the time of the shooting that [he] needed to talk to," including Angela Branch and Jonathan Borden. From his interviews with these witnesses, Investigator Loeffler learned that a silver Buick was the suspect vehicle and that a partial of the license plate had been obtained. While the driver had been originally described as male, the investigation ultimately focused on Myshauna Blair, who was known to have a masculine appearance. In addition, during Investigator Loeffler's interviews, several other "names came up" as possibly being involved in the shooting, including "a D-Ru, a Mook Mook, [and] a D-Bo."

Ultimately, Investigator Loeffler was able to track down Ms. Blair. As Investigator Loeffler approached Ms. Blair's mother's residence on April 4, 2012, he saw the silver Buick parked outside. According to Investigator Loeffler, at that time, Ms. Blair "very nonchalantly" came out of the house eating a sandwich. He informed Ms. Blair that her car would be impounded "[be]cause there was evidence on the car, as if there were paint scrapings, like . . . it came into contact with a green vehicle." Ms. Blair agreed to come to the police station for questioning. Investigator Loeffler opined that Ms. Blair "was very forthcoming" during interview, "want[ing] to tell her story." Based upon the information Ms. Blair provided during interview, Investigator Loeffler prepared a photographic array. According to Investigator Loeffler, Ms. Blair was able to identify Michael May, but she did not "know full names or correct names," rather only "street names" for the other two individuals. Ms. Blair was the only witness who identified Mr. May and the Defendant from photographic line-ups.

Investigator Loeffler also provided details about the scene following his arrival, including the Corvette's location, the bullet holes in the windshield, and the presence of blood on the driver's seat and on the ground. According to Investigator Loeffler, the bullet holes he observed were consistent with the shooter's standing on the front passenger's side of the victim's car. Investigator Loeffler also attended the autopsy and opined that the victim's wounds were also consistent with being shot from this angle because "the entrance wounds were on the right side of [the victim's] body."

Next, Investigator Loeffler discussed some letters that came into the possession of the KPD on July 15, 2012.[4] According to Investigator Loeffler, the "Teleserve unit" opened the packet of letters "because it wasn't addressed to anybody except" the KPD; and once the letters were read, they were forwarded to Investigator Loeffler. The packet's envelope bore a postmark of July 9, 2012.

Inside the packet was another envelope, an anonymous note, and three handwritten letters. The envelope inside was addressed to Trinity Peoples at 322 McConnell Avenue and showed a return of Damarkus Lowe at the Knox County Detention Facility's address. All three letters were dated June 6, 2012, and were signed "Y.G. D-Ru" or "Y.G. D-Ru TREE." The entire packet was introduced as an exhibit at trial.

Investigator Loeffler read pertinent portions of the letters for the jury. In the letter addressed to "Trinity," the author noted that "Shayra" came to visit him and then made the following statements:

---

[4] KPD Officer Rebecca Byers testified that she was responsible for securing the letters and logging them into evidence on July 15, 2012.

I'm starting to face the fact that I'm about to do life. . . . I got letters in here for JD and Weezy. Make sho duh get it, and tell Weezy to write back, but watch what he say. WB soon. I love you, sistah. Y.G. D-Ru. P.S. . . . [I]f you read the letter from Weezy and JD, then don't tell nobody about it, and don't let nobody read 'em who ain't Trees. Not no home girls on nu10, not even mama.

Investigator Loeffler then read the letter addressed to "Weezy." In this letter, the author asked, "And then I need you to do something important for me. I need you to get Little Tree and Mal-Ru, and they need a put in some work for the brothers, me and Murder-Ru." Investigator Loeffler testified that he understood Murder-Ru to "be a nickname or street name of Michael May." The author then identified "Mashonna" as the "da b---h dats snitchin' on me and Murder" and continued,

Little Tree know who she is. She living by the Heights, and she got a sistah that live in some apartments, but the Mashonna b---h be over there too. I need them to find out where it's at, and air that motherf--ker, the f--k out. Both places. Ru talk. She can get me and Murder life in prison. If y'all can't find out, then my family pooh might know her number . . . and if she don't know the Bronson and Braxton sistah Blair know for sure. . . . [T]hey need a shoot both places up and probably burn her crib down by the Heights. I don't give a f--k who in it, kids and all. Just remember, no face, no case. Ru talk. This part of banging, and that's what brothers do for each other. After they do that, [get that] b---h or her sister number, and have Jamaika Ru call and disguise her voice, and let them know if she show up in court again, that it's over for them and everybody them love. . . . If Jamaika won't do it, then get some female that we trust to do it. . . . Get on it ASAP. . . . But they read all mail so be careful what you write. Y.G. D-Ru Tree.

Investigator Loeffler said that "Heights" referred to "Western Heights" "a project in Knoxville," that "air it out" meant to "basically shoot somebody up, put holes in them," and that "ru talk" meant "real talk" or the "truth."

The third letter addressed to "J-Spruce" was entered as an exhibit but was not read to the jury. In that letter, "Y.G. D-Ru TREE" stated, among other things, that he knew he was facing life imprisonment.

The anonymous letter sent with the envelope and three letters was also entered as an exhibit but was not read to the jury. The anonymous author expressed concern over the contents of the "Weezy" letter:

-12-

This letter was dropped by my back door by my neighbor and the contents of one page caught my eye. It is addressed to a person called Weezy and it talks about a plan to have someone murdered. It concerns me because the neighbor harbors gang members with powerful guns. My family feels very threatened by the neighbor especially with all the shootings going on right outside our back door. The person in this letter needs protection and this matter taken seriously.

On cross-examination, Investigator Loeffler confirmed that he received a call from Angela Branch during the early morning hours of April 2, 2012. She wanted to speak with him, so she came to the station to give a statement. She relayed to Investigator Loeffler that she "had seen something on the news that [she] didn't think was quite what [she] saw." In this statement, Ms. Branch told Investigator Loeffler that she saw the driver of the Buick exit the vehicle before the men came through Raider's Field. Ms. Branch placed one individual on the driver's side of the Buick in front of the Corvette and three others on the passenger's side of the Buick. Ms. Branch said that two people shot into the Corvette—the driver of the Buick and another individual on the passenger's side of the Buick. According to Ms. Branch, it was the driver of the Buick who was in front of the Corvette and shot through the windshield.

Investigator Loeffler confirmed that he had not "reviewed any other writing samples from [the Defendant]" and that he had not "received any other copies of letters from Knox County Detention Facility from [the Defendant]." According to Investigator Loeffler, he received the packet of letters "within a week or two of the postmark." Moreover, Investigator Loeffler testified that he was unable to identify any other person who went by the name "D-Ru."

On redirect, Investigator Loeffler agreed that Ms. Branch also made additional statements during her April 2, 2012 interview. After Ms. Branch said, "The one I seen with the gun shot first," Investigator Loeffler asked her, "Okay. And that's the guy on the opposite side of the blue car the Corvette?" Ms. Branch responded, "Yeah. . . . The one that came running from the fence." Investigator Loeffler agreed that Ms. Branch was telling him that "the person that she saw first shoot was the person that she also saw coming through Raider['s] Field[.]" In Investigator Loeffler's experience, eyewitness accounts often varied.

Finally, Investigator Loeffler said that law enforcement also acquired the Defendant's phone.[5] He confirmed that "the phone calls made at the time of [the] shooting indicated that [the Defendant's] phone and Mr. May's phone were in contact with each other[.]"

---

[5] This appears to be the 7379 number.

D. Forensics.  KPD Officer Rebecca Byers testified that she worked for the forensics unit as a crime scene technician.  She was assigned to this case and responsible for photographing and collecting evidence.  She described the scene: the victim's driver-side door was open; the driver-side window was shattered on the ground; there were several bullet defects to the passenger-side of the victim's windshield, at least two but possibly three; tire marks; two bullet defects to the driver-side door, one at the top of the door that shattered the window and the other on the inside of the door; blood centered around the driver's seat; and damage to the front bumper, including an indentation and paint scratches.  There were no bullet defects observed to the rear of the victim's vehicle.  Moreover, Officer Byers stated that she was unaware of any contraband found inside the victim's vehicle.

After the car was towed to the impound lot, Officer Byers was able to recover two bullet fragments from the driver-side door.  In addition, Officer Byers opined that the two bullets hit the door travelling "from the inside out."

KPD Officer Beth Goodman was assigned to photograph and collect evidence from Ms. Blair's silver Buick.  Scuff marks with green paint flecks were noted on the driver-side of the vehicle.  Once the car was at the impound lot, Officer Goodman was able to retrieve paint scrape samples.

KPD Officer Patricia Resig was qualified as an expert in the area of firearms identification.  She testified that she examined the two bullet fragments taken from the victim's vehicle and the three bullet fragments recovered from the victim's body.  Because no weapon was ever identified in this case, Officer Resig could only look at the bullet fragments.  Officer Resig was able to conclude that two of the bullets removed from the victim's body "were fired through the same unknown barrel."  However, while the remaining three bullets displayed similar class and individual characteristics with the other two, she could not determine if they were fired from the same gun.  She opined that it was possible that all five bullets were fired through the same barrel but that it was also possible more than one gun was used.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, performed the victim's autopsy and concluded that the manner of death was homicide.  According to Dr. Mileusnic-Polchan, the victim was shot four times, once in the head, shoulder, chest, and abdomen.  Regarding the victim's head wound, Dr. Mileusnic-Polchan explained that it was a "through and through" wound, meaning that it went through the victim's brain and exited the other side.  The head wound would have been ultimately fatal.  In addition, Dr. Mileusnic-Polchan stated that the "main direction" of all four bullets was from right to left, "back to front," and "slightly downward."  Dr. Mileusnic-Polchan also said that all four of the wounds were "atypical," explaining that the bullets likely went through an intermediate target before striking the victim.

-14-

Dr. Mileusnic-Polchan was unable to determine the order in which the wounds were inflicted. As for the bullets, she noted that they were "unjacketed" and were "in the category of medium caliber." Moreover, Dr. Mileusnic-Polchan found "no evidence of close range firing." She opined that the shooter was on the victim's right side and "slightly to the back of the victim." If the victim was seated when he was shot, then, in Dr. Mileusnic-Polchan's opinion, "the person that fired the shot could have been potentially standing from a higher position."

E. <u>Defense Proof</u>. Michael Cohan was an investigator for the defense. He testified that he interviewed Angela Branch on February 2, 2014. Mr. Cohan asked her who was the individual who was shooting, and Ms. Branch replied that it was the driver of the Buick. According to Mr. Cohan, "[s]he went on to say that the driver of the Buick and the two guys that came through fence were shooting."

Myshauna Blair was recalled. She identified a picture from her Facebook account in September 2012 showing her holding two pistols. She claimed that neither of these weapons was used in these events and that neither of them belonged to her.

On cross-examination, Ms. Blair said that the victim's murder had "affected [her] tremendously." In addition to moving away from Knoxville, Ms. Blair also had to leave Georgia because she was still being threatened. According to Ms. Blair, no one knew where she was living presently. She noted that, prior to the shooting, she engaged in deviant behavior but now she had a job and had gotten her GED. She maintained that she was "in a better place now than [she was] then." Ms. Blair affirmed that she did not shoot the victim and that she did not know that Mr. May and the Defendant were going to shoot the victim.

The Defendant also called Kasandra Flood, Ms. Blair's ex-girlfriend. Ms. Flood said that she dated Ms. Blair for approximately five or six years and confirmed that they were dating in 2012. Ms. Flood denied that Ms. Blair came to visit her while she was working at the nursing home on the evening of April 1, 2012. She also denied ever talking with Ms. Blair about these events, stating that she only learned of the shooting after going home from work and seeing it on the news.

On cross-examination, Ms. Flood confirmed that she had spoken with Mr. Cohan, the defense investigator. According to Ms. Flood, this was the first time anyone had talked with her about this case. Ms. Flood acknowledged that she said to Mr. Cohan, "Did they put me in this? 'Cause I don't have nothing to do with this? I don't talk to her no more. I had nothing to do with that. I don't have nothing to do with her." She also agreed that she got "really upset" while speaking with him and that he had to ask her "to calm down." In addition, Ms. Flood averred that she was "not afraid of any retaliation that might happen to [her] for getting involved in this case[.]"

-15-

F. <u>Verdict, Sentence, and Appeal</u>.  Following the conclusion of the proof, the jury found the Defendant guilty of first degree premeditated murder in Count 1 and acquitted him of the especially aggravated kidnapping charges in Counts 2 and 3.  Thereafter, the Defendant was sentenced to life imprisonment.

The Defendant's timely motion for new trial was filed on July 23, 2014.  However, that motion languished in the trial court until the Defendant filed several pro se motions in January 2017 concerning the unreasonable delay in the proceedings, including a motion for leave to amend the motion for new trial, an amended motion for new trial, and a motion for findings of facts and conclusions of law.  In response, defense counsel filed an amended motion for new trial on February 17, 2017.  On February 23, 2017, the Defendant's motion for new trial was heard and denied, and a timely notice of appeal was forthcoming.  It is unclear from the record why two and half years elapsed between the filing of the original motion for new trial and a hearing on the motion.  Generally, such a lengthy delay is inexcusable because the timely resolution of criminal cases is essential to the pursuit of justice.  <u>See</u> <u>State v. Davis</u>, 466 S.W.3d 49, 78-80 (Tenn. 2015) (Lee, J. concurring).

## ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support his first degree murder conviction; (2) that admission of the packet of letters was improper because the letters were not properly authenticated, contained inadmissible hearsay, violated his confrontation rights, and were more prejudicial than probative; (3) that the recorded jail calls contained inadmissible hearsay and were, therefore, erroneously admitted in violation of his confrontation rights; (4) that testimony regarding his "street name" was irrelevant and more prejudicial than probative; (5) that the trial court acted in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), when it failed to compel the State to disclose the name of the jailhouse informant who claimed to have information related to the victim's murder; and (6) that the State committed prosecutorial misconduct during its closing argument requiring plain error relief.  We will address each in turn.

### I. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting his first degree murder conviction.  Specifically, the Defendant argues that the State failed to demonstrate premeditation, failed to prove the elements of criminal responsibility, and failed to corroborate the accomplice testimony of Ms. Blair.  The State counters that the evidence was sufficient.

-16-

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

A. *Premeditation and Criminal Responsibility*

The State explicitly argued at trial that it was proceeding under the theory that co-defendant May fired the shot that killed the victim and that the Defendant was criminally responsible for co-defendant May's actions. On appeal, the Defendant contends that there was insufficient evidence to establish premeditation because co-defendant May "made a split-second decision to start shooting into [the victim's] vehicle mere seconds

-17-

after arriving." The Defendant further submits that the State failed to establish that he was criminally responsible for co-defendant May's actions because "[t]here was no proof of . . . planning this act beforehand or discussing the relations of their goal after the fact." The State responds that the evidence was sufficient for the jury to conclude that Mr. May and the Defendant planned to shoot the victim and that the Defendant was criminally responsible for Mr. May's actions.

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Additionally, the Defendant's guilt in this case was predicated on his criminal responsibility for the conduct of co-defendant May. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. Dorantes, 331 S.W.3d at 386 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386

-18-

(citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); see State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

According to the evidence presented at trial, Ms. Blair and the victim had been arguing about the damage done to the victim's Corvette when they collided. Ms. Blair was setting up a payment plan to pay for the damage when the Defendant and Mr. May came through the football field towards their location. According to Ms. Blair, both men had their "guns out" as they approached. Ms. Blair testified that, when Mr. May arrived on the scene, he went to the front of the Buick and that the Defendant went to the back of the victim's car. Mr. May asked the victim "what was going on," and the victim repeated the events of the accident and said "y'all" are going to pay for the damage. Ms. Blair said that Mr. May shot first, firing three times without provocation through victim's front window, and that the Defendant shot at the back of the victim's vehicle. The unarmed victim suffered gunshot wounds to the head, shoulder, chest, and abdomen. After the shooting, the Defendant and Mr. May got inside the Buick, and Ms. Blair said that Mr. May "put the gun to" her and ordered her to drive away from the scene. They did not render aid to the victim and fled the scene. Ms. Blair described that, once the men were inside her car, it seemed like they did not care about what they done, "like it was a joke," or they were doing "it for fun." Moreover, Ms. Blair said that the Defendant threatened to kill her if she told anyone what had happened. Mr. Borden, who was approximately thirty or forty feet away from where the shooting occurred, confirmed that "two guys in a hoodie" were shooting into the Corvette, one shooter on the side of the Corvette and the other in the front. Ms. Branch also provided a similar version of events at trial. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish premeditation and that the Defendant knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission.

B. *Accomplice Corroboration*

The Defendant contends that Ms. Blair was an accomplice and that her testimony was not sufficiently corroborated. The State responds that, even if the jury found Ms. Blair to be an accomplice, her testimony was sufficiently corroborated.

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense. See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. State v. Green, 915 S.W.2d 827, 831 (Tenn.

-19-

Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted).

Our supreme court has described what is required to establish sufficient corroboration as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The corroborating evidence need only be "slight." State v. Griffs, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). While "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony," the "evidence is sufficient if it connects the accused with the crime in question." Id. Whether there is sufficient corroborating evidence is a question for the jury. Shaw, 37 S.W.3d at 903.

Here, Ms. Blair was listed as the victim in the two counts charging the Defendant with especially aggravated kidnapping. The Defendant argued that Ms. Blair was an accomplice who portrayed herself as a victim in order to cover up her involvement in the shooting. In addition, the trial court instructed the jury that they had to determine whether Ms. Blair was an accomplice and, if they determined that she was, whether her testimony was sufficiently corroborated. See Lawson, 794 S.W.2d at 369 (quoting Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978)) (concluding that, when the facts are in dispute or susceptible to different inferences that a witness may or may not be an accomplice, then whether said witness is an accomplice becomes a question of fact for the jury to decide).

First, we note that the Defendant goes through great pains to discredit Ms. Blair. However, the jury chose to accredit her version of events regarding the victim's murder. As we have stated time and time again, the determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury. Bland, 958 S.W.2d at 659.

Moreover, Ms. Branch testified that she saw two African-American males run through the football field and ultimately shoot into the victim's vehicle. Mr. Borden also saw two men shoot into the Corvette. Both placed the men at similar locations as Ms. Blair. After the shooting, law enforcement acquired the Defendant's cell phone and confirmed that "the phone calls made at the time of [the] shooting indicated that [the Defendant's] phone and Mr. May's phone were in contact with each other[.]" Furthermore, the Defendant's recorded jail calls and the three letters purported to be written by the Defendant indicate a consciousness of guilt. If the jury determined that Ms. Blair was an accomplice, we conclude that the evidence of corroboration, when viewed in a light most favorable to the State, is sufficient to sustain the Defendant's conviction.

## II. *Evidentiary Objections*

The Defendant raises several evidentiary objections on appeal. First, the Defendant argues that the packet of letters was not properly authenticated and contained inadmissible hearsay and that the danger of unfair prejudice outweighed the probative value of the letters. Second, the Defendant submits that the trial court erred in admitting the recordings of the jail telephone calls because they contained inadmissible hearsay and their admission violated his confrontation rights. Finally, the Defendant maintains that the trial court erred by allowing Ms. Blair to refer to the Defendant by his street name "D-Ru" because the probative value of this testimony was low in relation to its prejudicial effect. The State responds that the trial court properly admitted the evidence.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

Tennessee Rule of Evidence 404(b) generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." State v. Jones, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than

proving action in conformity with a character trait. Id. The rule sets out certain procedural requirements the trial court must follow:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The comments to Rule 404(b) provide that evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of the defendant, such as identity, motive, intent, or absence of mistake. Tenn. R. Evid. 404, Advisory Comm'n cmt; see also Jones, 450 S.W.3d at 891. A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." DuBose, 953 S.W.2d at 652.

In addition, "hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015), cert. denied, 136 S. Ct. 335 (2015).

In Crawford v. Washington, the United States Supreme Court held that testimonial hearsay statements violate a defendant's rights under the federal constitution's Confrontation Clause and are only admissible when (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. 36, 68-69 (2004); see also State v. Maclin, 183 S.W.3d 335, 345 (Tenn. 2006), abrogated on other grounds by State v. Cannon, 254 S.W.3d 287, 301-02 (Tenn. 2008). When hearsay is non-testimonial, the Tennessee Rules of Evidence govern its admissibility. State v. Franklin, 308 S.W.3d 799, 810 (Tenn. 2010). Non-hearsay statements—i.e., statements not admitted for the truth of the matter asserted—do not violate the Confrontation Clause, whether or not the statements are testimonial. Id.

## A. Packet of Letters

1. <u>Authentication</u>. The Defendant argues that the trial court erred in admitting the packet of letters, which contained one anonymous note, an envelope addressed to Trinity Peoples, and three letters purported to have been written by the Defendant, without a proper showing of chain of custody and without proper authentication of the letters. The State counters, arguing that the letters were properly authenticated.

Rule 901(a) of the Tennessee Rules of Evidence states as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through testimony from a witness with knowledge that a matter is what it is claimed to be or by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4). In addition, "[w]ithout drawing the boundaries of practical possibilities, the rule allows proof to the court of a myriad of distinctive characteristics that may convince the judge that a questioned document is authentic enough to let the jury consider it." Tenn. R. Evid. 901, Advisory Comm'n cmt.

Proof of chain of custody is further evidence of identification or authentication. See <u>State v. Leon Flannel</u>, No. W2007-00678-CCA-R3-CD, 2008 WL 4613829, at *15 (Tenn. Crim. App. Oct. 13, 2008) (citing <u>State v. Ferguson</u>, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987) (stating that tangible evidence may be properly introduced either when identified by a witness or the chain of custody is established)). "The concept of a 'chain' of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis." <u>Cannon</u>, 254 S.W.3d at 296 (citing Neil P. Cohen et al., <u>Tennessee Law of Evidence</u> § 9.01[13][c] (5th ed. 2005)). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" <u>State v. Scott</u>, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting <u>State v. Braden</u>, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, the State is not required to prove the identity of tangible evidence beyond all possibility of doubt, neither is the State required to exclude every possibility of tampering. <u>Id.</u> Rather, if the facts and circumstances regarding the evidence "reasonably establish the identity and integrity of the evidence," it should be admitted. <u>Cannon</u>, 254 S.W.3d at 296.

Authentication issues, including those determining whether the chain of custody has been established, are left to the discretion of the trial court. <u>Cannon</u>, 254 S.W.3d at 295 (citing <u>Scott</u>, 33 S.W.3d at 752; <u>State v. Beech</u>, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). The Defendant argues that the letters were not properly authenticated because the police could not establish a "chain of custody" for the period of time between

-23-

when the letters were written and when the police received them. He submits that "the integrity of the letters is highly questionable given that they were provided from an anonymous source[.]" Although the Defendant uses the phrase "chain of custody," this is not a chain of custody issue in the classic sense, i.e., the Defendant does not challenge the letters based upon how they were handled once they came into the possession of the police but is instead arguing that the State failed to properly authenticate the letters as being written by the Defendant given the facts and circumstances surrounding how the police came into possession of them. See Flannel, 2008 WL 4613829, at *16 (addressing the defendant's assertion that the State failed to establish the chain of custody by clarifying that "proof of chain of custody is required only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been tampered with, substituted, or altered" and by noting that "there are many methods for authenticating a document" pursuant to Rule 901).

We now address the crux of the issue, that is, whether the letter was properly authenticated. In the June 6, 2012 letter to "Trinity," the individual said that "Shayra" had recently come to visit him, and Desharya Taylor visited the Defendant on June 1, 2012. The envelope inside the packet was addressed to Trinity Peoples at 322 McConnell Avenue, and the mail logs showed that the Defendant sent a letter to Ms. Peoples at this address on June 7, 2012. The Defendant wrote multiple letters to both Desharya Taylor and Trinity Peoples while incarcerated. Ms. Blair testified that she knew the Defendant by his nickname or street name of "D-Ru," and she said that the caller ID on Mr. May's phone showed "D-Ru" was calling when Mr. May called for a ride to pick them up. The Defendant identified himself and responded to "D-Ru" on the jail phone call recordings. All three of the letters were signed by "D-Ru" or "D-Ru TREE." Thus, the contents of the letters provided support for the conclusion that they were written by the Defendant as the State claimed. See Tenn. R. Evid. 901; see, e.g., State v. Bobby Jackson, No. W2009-02232-CCA-R3-CD, 2011 WL 1849096, (Tenn. Crim. App. May 11, 2011) (holding that the trial court did not abuse its discretion by admitting a letter purportedly written by the defendant because the officers' testimonies sufficiently established the identity and integrity of the evidence); Flannel, 2008 WL 4613829, at *16 (concluding same when the letter contained specific and distinctive information about the crime as well as personal matters which only the defendant would know)

In addition, the evidence at trial showed that the KPD received the packet on July 15, 2012, and that the packet was opened by the "Teleserve unit" and forwarded to Investigator Loeffler. According to Investigator Loeffler, he received the packet of letters "within a week or two of the postmark." Moreover, Investigator Loeffler testified that he was unable to identify any other person who went by the name "D-Ru." While a handwriting expert would have been helpful, such was not required of the State to

-24-

authenticate the letters.  See Tenn. R. Evid. 901.  Accordingly, the trial court did not abuse its discretion in admitting the letters because there was sufficient evidence to support the finding that the Defendant authored the letters in question.

2. Hearsay.  The Defendant also argues that the letters were inadmissible hearsay and that their admission violated his confrontation rights.  According to the Defendant, "the entire packet of letters should be reviewed collectively; that is, both the anonymous note and the three letters purportedly sent from the detention facility."  The Defendant contends that the letters were inadmissible because the declarant's identity was unknown.  He further maintains that "the introduction of these documents, whose existence was primarily developed by an anonymous source, deprived him of his right to confrontation because he was unable to cross-examine this source."

As noted above, the three letters signed by "D-Ru" were properly authenticated because there was sufficient evidence to support a finding that the letters were written by the Defendant.  Because those letters contained the Defendant's own statements, they were admissible as an exception to the hearsay rule.  See Tenn. R. Evid. 803(1.2)(A) (providing that "[a] statement offered against a party that is . . . the party's own statement in either an individual or representative capacity" is "not excluded by the hearsay rule").  Additionally, admission of the Defendant's own statements does not implicate the Confrontation Clause.  See Canady v. State, 461 S.W.2d 53, 60 (Tenn. Crim. App. 1970) (holding that the defendant could not claim that his own statement violated his right to confrontation); see also United States v. Brown, 441 F.3d 1330, 1358-59 (11th Cir. 2006).

To the extent that the Defendant argues that the anonymous note was improperly admitted into evidence, we note that the trial court initially determined that the anonymous note was not admissible.  However, once the trial court found that the three letters purportedly written by the Defendant were properly authenticated, the Defendant did not object to admission of the anonymous note.  Accordingly, any issue with the anonymous note was waived.  Moreover, the note was not offered for the truth of the matter asserted but to show how the police came into possession of the letters.

3. Relevance.  Finally, the Defendant argues that the probative value of the letters was outweighed by the danger of unfair prejudice because "[t]he letters . . . contain a great deal of inflammatory language, curse words, jargon, and 'other crimes, wrongs, or acts' pursuant to" Tennessee Rule of Evidence 404(b).  According to the Defendant, "[b]ecause the State already had other independent means of establishing [the Defendant's] nickname as 'D-Ru' ([the Defendant's] jail calls, Ms. Blair's testimony), identity was not a material issue."  The Defendant submits that the letters had the "devastating effect" of portraying Ms. Blair as a victim, thus making her "a more sympathetic witness."

We agree with the State that "[t]he letters were highly probative of the [D]efendant's guilty knowledge and identity as one of the shooters." Again, the letters evidence the Defendant's consciousness of guilt. The letter to "Weezy," which called for someone to shoot at and burn down Ms. Blair's home, corroborated Ms. Blair's testimony that she and her mother were targeted and threatened. The Defendant acknowledged in the "Weezy" letter that he was facing life in prison. The fact that the letters were signed by "D-Ru" or "D-Ru TREE" validated Ms. Blair's identification of the Defendant as one of the shooters.

Moreover, after Investigator Loeffler read the letter to "Weezy" into evidence, the trial court instructed the jury how it was to consider evidence of another crime:

> If, from the proof, you find that the [D]efendant has committed a crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. This evidence may only be considered by you for the limited purpose of determining whether it provides either the complete story of the crime; that is, such evidence may be considered by you where the prior or the other crime and the present alleged crime are logically related or connected or a part of the same transaction, so that proof of the other tends or is necessary to prove the one charge or is necessary for a complete account thereof, or you may consider it . . . as to establishing the [D]efendant's identity; that is, such evidence may be considered by you if it tends to establish the [D]efendant's identity in the case on trial.

The jury is presumed to follow the trial court's instructions. State v. Walker, 910 S.W.2d 381, 397 (Tenn. 1995). Accordingly, we cannot say that the trial court abused its discretion in admitting the evidence.

### B. *Recorded Jail Calls*

Next, the Defendant claims that the trial court erred by admitting into evidence his recorded telephone calls from jail. According to the Defendant, the statements of the other persons who were speaking during the calls were inadmissible hearsay, and in addition, admission of the recordings deprived him of his right to confront the other persons involved in those conversations. The State argues that statements of the other persons on the recordings were not hearsay because they were introduced to put the Defendant's statements into context, not for the truth of the matter asserted. The State surmises that, because the statements were not hearsay, the Defendant's confrontation rights were not violated. The Defendant complains that "the State's utilization of these statements strengthened its closing argument far beyond mere context, to paint a picture of [the Defendant's] mental state and his family's concerns about his criminal liability."

Upon review, we discern no error in the trial court's admission of the evidence. Again, the Defendant's own statements on the recordings qualify as an admission by a party opponent, which are not excluded by the hearsay rule. See Tenn. R. Evid. 803(1.2). The other individuals speaking on the various phone calls provided context for the Defendant's admissible statements and were not offered for their truth. See, e.g., State v. Kendell Edward Johnson, No. M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *18-19 (Tenn. Crim. App. Aug. 29, 2012) (determining that a witness's statements on a tape recording were not offered for the truth of the matter asserted but solely for the purpose of providing the context for the defendant's statements); State v. George Anthony Bell, No. M2008-01187-CCA-R3-CD, 2009 WL 3925370, at *6 (Tenn. Crim. App. Nov. 19, 2009) (concluding that "statements made during recorded conversations between an informant and a non-law enforcement party generally are admissible because they are not offered for the truth of the matter they assert"); see also Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01 [10], 8-27 (6th ed. 2011) ("Statements designed to (1) provide a context for, or (2) permit an understanding of, another statement may not be hearsay.").

Regarding the Defendant's confrontation issue, the statements of the other individuals speaking during the recorded phone calls were not hearsay because those statements were not offered for the truth of the matter asserted. Tenn. R. Evid. 801(c); see State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980). As the trial court instructed, those statements were not offered or intended to be substantive evidence. Rather, they were offered solely for the purpose of providing the context of the Defendant's statements. If the other individuals' comments had been completely redacted from the tapes, the Defendant's statements would have made little sense. See State v. Price, 46 S.W.3d 785, 804 (Tenn. Crim. App. 2000) (citing State v. Gibson, 973 S.W.2d 231, 243 (Tenn. Crim. App. 1997)) (additional citation omitted). The State did not ask the jury to believe what those individuals said on the recording, instead the primary objective was to bring before the jury the statements made by the Defendant. See Gibson, 973 S.W.2d at 243 (citing Jones, 598 S.W.2d at 223). Because the statements of the other individuals speaking on the recording are non-hearsay, the issue of confrontation does not apply. See Franklin, 308 S.W.3d at 810; see also State v. Edward Joseph Benesch II, No. M2015-02124-CCA-R3-CD, 2017 WL 3670196, at *34 (Tenn. Crim. App. Aug. 25, 2017) (holding that admission of the interview as redacted did not violate the Confrontation Clause because the officers' statements were not introduced for their truth but rather to provide context for the witness's responses); State v. Derrick Sorrell, No. W2006-02766-CCA-R3-CD, 2009 WL 1025873, at *5 (Tenn. Crim. App. Apr. 8, 2009) ("The audiotape contained a conversation between the defendant and a second person and cannot be barred by the Confrontation Clause because the conversation was not offered for truth, but instead for context and evidence of knowledge.").

In addition, the <u>Jones</u> court held that tape recordings may be presented by any witness who was present during the recording or any witness who monitored the recording as long as he can identify the declarant with certainty and his testimony comports with the other rules of evidence. 598 S.W.2d at 223. The court continued,

> In all such cases the jury should be instructed that only the statements, admissions and declarations of the declarant may be considered in the question of guilt or innocence. Further any statement made by a non-testifying party to the conversation which tends to be prejudicial to the defendant must be redacted, unless admissible under some other rule of law.

<u>Id.</u> In <u>Jones</u>, the court found that full opportunity was given to cross-examine the agent who presented the transcripts to the jury. <u>Id.</u> at 224.

The same can be said in the case at hand, the Defendant was given and used his full opportunity to cross-examine Lieutenant Patrick, the officer who presented the recordings to the jury. Moreover, before playing the recordings of the telephone calls, the trial court instructed the jury that the Defendant's statements on the recordings were admissible as substantive evidence. Regarding the statements made by the other parties to the calls, the trial court instructed as follows:

> Now, in a call like this where you're hearing two people, you can only understand . . . the meaning of the [D]efendant's statement by hearing the context of the other side of the call. So we're going to play both sides to this, but in thinking about . . . these calls, when you deliberate, you can only consider the statement made by the [D]efendant as substantive evidence. The statements made by the other person on the other end of the call is merely played for you for you to understand the context of the [D]efendant's statement. They aren't offered to prove the truth of the matter, whatever the person was saying. Okay?

Because the State did not offer the statements by the other individuals to the phone conversations as substantive evidence, those statements were not hearsay, and they did not violate the Defendant's right to confrontation. Moreover, the instruction referenced in <u>Jones</u> was given. Accordingly, the Defendant is not entitled to relief.

### C. *Street Name*

The Defendant contends that the trial court erred by allowing Ms. Blair to testify regarding the Defendant's nickname or "street name" of "D-Ru." He argues that Ms. Blair's knowledge of the Defendant's nickname was irrelevant because she "affirmatively

stated that she knew [the Defendant] by name." Alternatively, the Defendant submits that the probative value of Ms. Blair's identifying the Defendant as "D-Ru" was low "when measured against the danger for unfair prejudice." The State argues that the trial court correctly ruled that the nickname was relevant to identify the Defendant and that there was nothing "tremendously prejudicial" about the moniker "D-Ru."

According to Investigator Loeffler, Ms. Blair was only able to identify the Defendant by his street name "D-Ru." Moreover, when Ms. Blair was asked at trial if she knew the Defendant "by any other name other than Damarkus," she replied, "D-Ru." While this statement of Ms. Blair was somewhat ambiguous, we disagree with the Defendant that Ms. Blair "affirmatively stated that she knew [the Defendant] by name." The Defendant identified himself as "D-Ru" on the telephone calls and responded to that nickname when used by others. The three letters were signed by "D-Ru" or "D-Ru TREE." We conclude that the testimony regarding the Defendant's nickname was relevant to Ms. Blair's identification of him as the shooter, and it placed the Defendant with Mr. May just before the shooting took place. See, e.g., State v. Kenneth James Watkins, No. M2010-00886-CCA-R3-CD; 2011 WL 3557096, at *24 (Tenn. Crim. App. Aug. 11, 2011) (concluding that the testimony regarding the defendant's nickname was relevant to eyewitness's identification of him as the shooter) (citing State v. Aubrey Tremaine Eisom and Cedric Moses, No. W2009-02098-CCA-R3-CD, 2010 WL 4540069, at *17 (Tenn. Crim. App. Nov. 5, 2010) (considering witnesses' testimony regarding the defendant's nickname to be corroborative of an eyewitness's identification of the defendant by his nickname)). Moreover, the Defendant's nickname was relevant to establish his identity as the author of the letters.

The Defendant argues that, if the testimony regarding his nickname was relevant, the trial court still erred by allowing it because the testimony was unfairly prejudicial. We do not agree. Whether the Defendant was in fact "D-Ru" was a contested issue at trial, and his identity as "D-Ru" offered significant corroborative evidence of Ms. Blair's testimony. There was nothing overly prejudicial about the moniker "D-Ru" in itself. We conclude that the trial court did not abuse its discretion by allowing Ms. Blair to testify about the Defendant's nickname because the probative value of the testimony substantially outweighed any danger of unfair prejudice.

### III. *Brady Violation*

The Defendant claims that the prosecution violated his constitutional right to due process, and in particular the principles announced in Brady v. Maryland, 373 U.S. 83 (1963), by waiting until the day of trial to alert the defense that an inmate had provided information related to Ms. Blair's involvement in the victim's murder. According to the Defendant, the trial court erred when it refused to compel the State to provide the name of this confidential informant who had "material" information about whether Ms. Blair

possessed a firearm during the episode. The State responds that its "failure to turn over this information prior to the day of trial was not a Brady violation because the information was not favorable to the [D]efendant and it was not material."

On the first day of trial, the prosecutor stated that, while "pulling everything together" for trial, she discovered a note "from a conversation that [she] had with an inmate in the jail[.]" She alleged that the confidential informant told her the following: "[T]he information was that [the victim] was a Gangster Disciple, and that . . . he heard talk in the jail, not specific, didn't know who he talked to, that this . . . was a setup, that [the victim] had been targeted, that it was gang related[.]" The confidential informant also said that "the girl got the gun and sold the gun or tried to sell the gun." According to the prosecutor, when the confidential informant volunteered this information, she was speaking with him about an unrelated case and "he was in trouble" after absconding and "was trying to help himself[.]" The prosecutor also averred that she "didn't pay any attention to" the confidential informant's statements because it conflicted with the evidence and the statements from the other witnesses. Defense counsel then argued that, under Brady, the State should be required to disclose the name of the confidential informant because the information he could provide was clearly "exculpatory" and indicated that Ms. Blair was an accomplice. The trial court denied defense counsel's request.

On the second day of trial, following Ms. Blair's testimony, defense counsel renewed his request for the name of the confidential informant, noting that Ms. Blair "denied knowledge of possessing a gun in the course of this incident or following this incident or getting rid of a gun or anything to do with it." Defense counsel expressed his desire to "investigate some pretty interesting allegations in the . . . middle of trial." Upon questioning by the trial court, the prosecutor confirmed that "the person that this information came through didn't . . . have personal knowledge that Ms. Blair had had a weapon or got rid of a weapon[.]" She continued, "What [the confidential informant] told me was that he heard jail talk. . . . It wasn't like he was saying he was talking to [the Defendant] or Mr. May. Just jail talk." She opined that the information "just wasn't competent." The trial court concluded that any jail talk would be inadmissible and that the information provided by the informant "was a little too questionable" to lead anywhere. Accordingly, the State was not required to disclose the confidential informant's name to the defense.

In Brady, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to establish a Brady claim, a defendant must establish the following:

-30-

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove these due process violation prerequisites by a preponderance of the evidence. Id. (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

Evidence is "favorable" if it is deemed to be exculpatory in nature or could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). "[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness" falls within the Brady disclosure requirement. State v. Jackson, 444 S.W.3d 554, 593 (Tenn. 2014) (quoting Johnson, 38 S.W.3d at 56-57).

Here, the State disclosed the substance of its conversation with this confidential informant on the first day of trial. Accordingly, the issue before this court concerns a delayed disclosure of evidence, not a complete nondisclosure. Tennessee courts analyze delayed disclosure differently from outright suppression, focusing on the prejudice of the delay. See State v. Twain Demario Vaughn, No. M2006-01659-CCA-R3-CD, 2008 WL 110094, at *6 (Tenn. Crim. App. Jan. 9, 2008). In United States v. Blood, the Sixth Circuit stated, "Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose and that a [d]elay only violates Brady when the delay itself causes prejudice." 435 F.3d 612, 627 (6th Cir. 2006) (citing United States v. Bencs, 28 F.3d 555, 560-61 (6th Cir. 1994)) (quotations omitted); see also State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting) ("no violation occurs as long as Brady material is disclosed to a defendant in time for its effective use at trial." (quotation omitted)). In addressing the difference between delayed disclosure and nondisclosure of evidence, this court has held as follows:

Indeed, when there has been a delayed disclosure of evidence, as opposed to a complete non-disclosure, Brady is normally inapplicable unless the delay itself causes prejudice. When there has been a delayed disclosure, as opposed to a non-disclosure, the appellant must establish that the delayed disclosure prevented him from using the disclosed material effectively in preparing and presenting his case.

State v. Larry Boykin, No. E2005-01582-CCA-R3-CD, 2007 WL 836807, at *13 (Tenn. Crim. App. Mar. 20, 2007) (citations omitted).

Although the State did not out-and-out suppress the evidence, we cannot say with any certainty whether the delayed disclosure of this information "itself caused prejudice." The trial court ruled that the State was not required to divulge the name of the confidential informant, and we, therefore, have no guidepost as to what evidence further questioning of this informant would have revealed. Thus, our determination of whether the information provided by the confidential informant was either material or favorable to the Defendant is more germane to our analysis.

The State is generally not required to disclose the identity of a confidential informant except when the informant (1) participated in the crime, (2) witnessed the crime, or (3) "has knowledge which is favorable to the defendant." State v. Ostein, 293 S.W.3d 519, 526 (Tenn. 2009) (citing State v. Vanderford, 980 S.W.2d 390, 397 (Tenn. Crim. App. 1997)). The defendant must show by a preponderance of the evidence the circumstances that entitle him to the confidential informant's identity. Ostein, 293 S.W.3d at 528; Vanderford, 980 S.W.2d at 397. The State is not required to divulge the identity of the informant if the defendant fails to establish the materiality of the confidential informant to his defense. Vanderford, 980 S.W.2d at 397. A trial court's decision about whether to order the disclosure of a confidential informant's identity is reviewed by this court for an abuse of discretion. Ostein, 293 S.W.3d at 526 (citing House v. State, 44 S.W.3d 508, 512 (Tenn. 2001); United States v. Sharp, 778 F.2d 1182, 1187 (6th Cir. 1985); Vanderford, 980 S.W.2d at 396-97).

It is evident that the confidential informant was neither a witness to the crime nor a participant in the crime; accordingly, the issue is whether the confidential informant had knowledge that would have been favorable to the Defendant or if the confidential informant's identity would have been helpful to the defense or essential to a fair trial. The Defendant asserts that the trial court erred by refusing to compel the State to divulge the name of a confidential informant. Thus, he claims that he was deprived of discovering potentially relevant information. The defense points out that "the information was favorable to [the Defendant], in that it highlighted that Ms. Blair's role in this event was contrary to her previous police statement and trial testimony[,]" and that "Ms. Blair's testimony constituted the bulk of the State's case."

The confidential informant's knowledge was gathered through "jail talk," and according to the prosecutor, the informant could not remember who provided him with this information. The informant had no direct knowledge from anyone involved in the case. In addition, the inmate only volunteered this information upon his apprehension after absconding, and there was no evidence to corroborate his claim. The trial court determined that any testimony by the confidential informant about jail talk would be

inadmissible and that the information was "a little too questionable" to lead to any admissible evidence. We agree. The Defendant has not shown that disclosing the name of the confidential informant would have been helpful to his defense or was essential to a fair determination of the trial. See State v. Maddox, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997) (citing State v. Taylor, 763 S.W.2d 756, 760 (Tenn. Crim. App. 1988)) (holding that the trial court did not err by refusing to compel the State to divulge the name of an inmate who claimed that the defendant's girlfriend had information pertaining to the robbery); West v. State, 466 S.W.2d 524, 526 (Tenn. Crim. App. 1971) (affirming trial court's refusal to compel the State to reveal the names and whereabouts of two anonymous inmates who shared in the reward money for information leading to the arrest and conviction of those responsible for the murder).

## IV. *Prosecutorial Misconduct*

The Defendant contends that the State committed prosecutorial misconduct during its closing argument and asks this court to review the closing argument for plain error. The State contends that the Defendant has not shown his entitlement to plain error relief.

The Defendant concedes, and we agree, that his failure to raise a contemporaneous objection during closing argument waives plenary review of his claim on appeal. See Tenn. R. App. P. 36(a) (providing that appellate relief is not available for a party who "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004) (holding that the issue of prosecutorial misconduct during closing argument is waived if the defendant does not make a contemporaneous objection). In addition, the Defendant failed to challenge the prosecutor's closing argument in his motion for new trial or amended motion for new trial, again failing to properly preserve these claims. See Tenn. R. App. P. Rule 3(e) (stating that "no issue presented for review shall be predicated upon . . . action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial"). Accordingly, the Defendant is not entitled to relief on appeal unless the prosecutor's remarks constitute plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

There are five factors that must be established before an error may be recognized as plain:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the accused did not waive the right for

tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. Furthermore, the error must be "clear" or "obvious," State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007), and must be of "such a great magnitude that it probably changed the outcome of the trial." Smith, 24 S.W.3d at 283.

While the scope and depth of closing argument is generally a matter within the trial court's discretion, State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994), the State is not free to do what it wishes. Arguments are required to be "temperate, based upon the evidence at trial, relevant to the issues being tried, and not otherwise improper under the facts of the law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). Although not exhaustive, this court has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. Id. at 6.

First, we must comment on the Defendant's appellate brief. On appeal, the Defendant alleges that the State committed prosecutorial misconduct during closing argument relying on "a distillation of improper comments made by the State." The initial closing statement by the State is approximately twenty-one pages long, and the Defendant cites to no less that fifteen pages as containing objectionable material, often including multiple lines from each page. He also quotes from three of the five pages of the State's rebuttal closing argument. The Defendant frequently does not identify which of these comments he views as objectionable and which are merely provided for context. After the overabundance of quotations, the Defendant surmises that "[t]he cumulative effect of these statements . . . went beyond the bounds of what is permissible during closing arguments." He then maintains that "the State breached its duty to refrain from expressing a personal belief or opinion as to the truth or falsity of the evidence of the [D]efendant's guilt, and made statements calculated to inflame the passions or prejudices of the jury." Specifically, he submits, "This case hinged on the credibility of Ms. Blair, and time and again, the State personally vouched for her was well as Ms. Branch, while personally discrediting the defense witness, Ms. Flood." Furthermore, according to the

-34-

Defendant, the issue was not waived for tactical reasons because allowing these remarks "did not benefit [him] in any way."

We decline to parse the State's entire closing argument for instances of misconduct. In light of the Defendant's summation of his argument on this issue, we will focus on the prosecutor's remarks that, according to the Defendant, allegedly vouch for Ms. Blair's, Ms. Branch's, or Ms. Flood's credibility.[6]

The closing argument remarks cited by the defense regarding Ms. Blair:

1. "So we don't know where that bullet was. It wasn't found at the scene, just as cartridges were not found at the scene, and <u>that's because Myshauna Blair is telling the truth when she said that both of these men had revolvers</u>, and if any of you know about guns—and I forgot to voir dire you on that issue. . . . Hopefully, some of the people on the jury understands what that means. When a weapon is fired and it's a revolver, the cartridge remains in the gun. So the only evidence that we would have, of course, would be bullets."

2. "Now, how else do we know that <u>Myshauna was being honest</u> with Investigator Loeffler when . . . she talked to him? Well, you know, the fact that she was willing to talk to him under these circumstances. Now, think about it. . . . It took a lot of guts for her to come forward and to identify these two people as the people who were involved. Okay?

. . . Nobody had identified her. She didn't have to tell the police what happened. . . . Could always say, somebody else took my car. I wasn't there. I loaned my car to these guys. She didn't do that. . . . And she did that, ladies and gentlemen knowing what these men were like, and I got to tell you, you know, that takes guts because on the streets people have a reason to fear.

There is retaliation on the streets. There is a reason for people to not want to come forward. Nobody in this case wanted to come forward. Nobody wanted to get involved. All of these people, except Myshauna, still live here. They have every reason to be afraid, because as I said, we're dealing with two men who have no regard for human life. None. . . . "

3. "And Michael May was definitely involved, and we've proven that too. So when Myshauna Blair said that Michael May was a part of it,

---

[6] We have edited and added to these remarks for clarity and to place them in their proper context.

when she says that he stood there and shot at [the victim], <u>she was telling the truth</u> . . . ."

4. "The other reason that we know <u>Myshauna is telling the truth is that she told the truth about how the accident happened</u>, and that's borne out by the physical evidence."

5. "You know, <u>she wasn't lying to you</u>, ladies and gentlemen. <u>It happened the way that she said that it happened</u> . . . ."

(Emphases added). The closing argument remarks cited by the defense regarding Ms. Branch:

1. Now, if Myshauna Blair was in front of the windshield of [the victim's car] next to Michael May, [Mr. Borden] would have seen that. He didn't see that because she wasn't there. Why would Angela say to Investigator Loeffler and to the defense investigator, why would she say that she saw that? <u>Well, I don't think she's lying</u>. Okay? I think that she's just a young woman who witnessed a very traumatic, dynamic incident . . . .

2. You know, it would be really unusual for every person who was out there to agree—you know, to agree about every detail that happened. It's very easy for somebody who's experiencing a traumatic event, especially, when they're crouching down and they're hiding, you know, out of fear to . . . get things jumbled up, to make mistakes. <u>That doesn't mean that they're telling lies. It just means that they're mistaken</u>.

And Angela, I think when she realized that she was going to have to come to trial, she was going to have to testify under oath and swear that this was her recollection, she began to realize, hey you know, . . . maybe I was wrong about that. Maybe that didn't happen exactly that way, and <u>so this is not to say that she's a liar. It's just somebody who was wrong and was willing to admit that they were before she took that oath</u>. Okay?

(Emphases added). Finally, the closing argument remarks cited by the defense regarding Ms. Flood:

1. [After reading a portion of the letter allegedly authored by the Defendant:] That would scare me. That would scare me. If I was Myshauna's sister and I knew about that, I would be scared to go home. If I was Myshauna's mother, I would be scared. If I was Myshauna's girlfriend or ex-girlfriend, I would be terrified to get involved. . . . <u>I might</u>

-36-

be willing to lie to save my hide. Think about it. Think about—think about the prospect.

2. I don't care what her girlfriend says. Her girlfriend lied, because her girlfriend still lives here, and, you know, and it probably hurt Myshauna's feeling[s] that her girlfriend lied, and it probably made her mad, but, you know, Myshauna doesn't live here anymore, and Kasandra Flood does, and she knows these people. She may not want to admit it to you, but she knows who they are, and they know her. They know her.

(Emphases added).

First, we note that the record reflects that defense counsel made similar comments during closing argument regarding Ms. Blair's credibility: "Are there shades of truth to what she say? Yes, of course, because sure as many of you have experienced in life, that's the best lies, half truths, part truths, but she holds back the important stuff. She has to, and it ends up working out pretty darn good for her." (Emphases added); "She had every motivation and she had the opportunity to lie in this case, and that's what she's done. And if you believe her story, then you believe the [S]tate's case, but we would submit to you that she had everything to lose, that she had to tell this tale."; "So we would submit to you again this corroborates that Myshauna Blair has been less than forthcoming with her remembrance of the events that day . . . ." (Emphases added). Commenting on Ms. Branch's credibility, defense counsel said, "[O]ne of the really interesting things in this case is Angel[a] Branch, and, you know, the [S]tate's position is that she made a mistake, and, you know, to tell you the truth, I think that's . . . a fair reflection. Okay? But we need to look at why she would not remember things exactly the same way." (Emphasis added). Defense counsel then insinuated that Ms. Branch was likely afraid of Ms. Blair. Thus, it is possible that the failure to object was not an inadvertent or negligent oversight by defense counsel but rather a strategic decision to rebut the prosecutor's comments with defense counsel's own argument. "[I]t has long been recognized that '[t]he question of whether to object to improper argument is a tactical decision for counsel.'" State v. Charles Owens, No. M2005-02571-CCA-R3-CD, 2007 WL 1094136, at *6 (Tenn. Crim. App. Apr. 12, 2007) (quoting State v. Compton, 642 S.W.2d 745, 747 (Tenn. Crim. App. 1982)).

Certainly, a lawyer should not assert his or her personal opinion as to the credibility of a witness or as to the accused's guilt or innocence. State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Cirm. App. 1999) (citing State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989)). Although a prosecutor is prohibited from expressing a personal opinion on a witness's credibility, he or she may argue based upon an analysis of the evidence and the conclusion supported by the evidence. See Tenn. S. Ct. R. 8, RPC 3.4(e)(3); see also 75A Am. Jur. 2d Trial § 692 (1991) ("The credibility of a witness is a proper subject

for closing argument, but as a matter of professional ethics a lawyer may not state a personal opinion as to the credibility of a witness.") & § 699 ("The general rule . . . is that it is improper for an attorney to vouch for or assert his personal opinion as to the credibility of a witness since it is not proper for counsel to take the position of an unsworn witness as to credibility."). This issue of "[w]hether a statement qualifies as misconduct often depends upon the specific terminology used." Thornton, 10 S.W.3d at 235 (citing United States v. Stulga, 584 F.2d 142, 147 (6th Cir. 1978) (stating that "[t]he use of the words 'submit' are not the equivalent of expressing an opinion.")).

Moreover, for a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. State v. Middlebrooks, 995 S.W.2d 550, 559 (Tenn. 1999). In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In spite of the fact that the prosecutor at times vouched for the credibility of witnesses during closing argument, we conclude that none of the statements adversely affected a substantial right of the Defendant by having any effect on the jury's verdict. Ms. Blair's credibility was bolstered by the Defendant's own statements in the letters he wrote from jail wherein he sought retribution and by his comments in the recorded jail telephone calls. Her testimony was also corroborated by Mr. May's cellular telephone records. The prosecutor's statements were commentary on the evidence relevant to Ms. Blair's credibility.

In addition, Ms. Branch provided favorable testimony to the State at trial, and it was the defense who sought to discredit her with her prior inconsistent statements, which were not admissible as substantive evidence. Ms. Branch averred that she was "trying to do [her] best to remember." The prosecutor's comments were an attempt to address these discrepancies in Ms. Branch's testimony that were pointed out by the defense. In Investigator Loeffler's experience, eyewitness accounts often varied.

Regarding Ms. Flood, the prosecutor was insinuating that she had incentive to lie because she still lived in the area and feared retribution. Moreover, the trial court provided the jury with the general instructions that arguments of counsel were not evidence. See State v. Banks, 271 S.W.3d 90, 131 (Tenn. 2008); State v. Framer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). Accordingly, plain error relief is unwarranted.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE